# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

MARVIN MULLINS v. ROY SANDERS.

June 20, 1949.

Record No. 3510.

Present, All the Justices.

The opinion states the case.

G. *Mark French*, for the plaintiff in error.

A. *M. Phipps*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Marvin Mullins filed an action of trespass on the case against Roy Sanders seeking damages on three counts, namely, (1) false imprisonment, (2) malicious prosecution, and (3) malicious abuse of criminal process. At the conclusion of all of the evidence the lower court struck the plaintiff's evidence and a verdict and judgment for the defendant followed. We granted a writ of error to determine whether the evidence was sufficient to have warranted a submission of the issues involved to the jury.

At the bar of this court counsel for the plaintiff in error conceded that the evidence was insufficient to sustain the charge of malicious prosecution, and hence we are now concerned with the sufficiency of the evidence with respect to the allegations in the other two counts. For convenience we will sometimes refer to the parties by the positions occupied by them, respectively, in the court below.

The plaintiff, Marvin Mullins, and Jesse Carter operated a small coal mine in Dickenson county under the partnership name of Mullins & Carter. On September 20, 1947, Mullins purchased for the partnership from Roy Sanders, at the latter's home in Dorton, Kentucky, a gasoline motor for the sum of $90. Mullins gave in payment for the motor a check drawn by the partnership on the Cumberland Bank & Trust Company of Clintwood, Virginia. The check was signed "Mullins & Carter," the name "Mullins" and

the character "&" being written and signed by Mullins, and the name "Carter" being written and signed by the latter.

The two partners had opened the bank account earlier during the day and had made a deposit of more than $500. They understood that all checks were to be signed similarly to the one which had been given to Sanders, although the rather crudely written signature card indicates that the partnership signature was to be followed by the signed *surname* of one or perhaps both of the individual partners. As a matter of fact, on the day the account was opened, and within the next two or three days thereafter, the bank paid ten checks which were signed in the same manner as that in which the check given to Sanders was signed.

Sanders deposited the check which Mullins had given him in the First National Bank of Pikeville, Kentucky, and when it was forwarded for collection to the Cumberland Bank & Trust Company, although there were ample funds in the partnership account to meet the check, payment thereof was refused on the ground that the signature was improper.

Sanders then came from his home at Dorton, Kentucky, to Clintwood, Virginia, a distance of some forty miles, and presented the check in person to the Cumberland Bank & Trust Company, which again declined to pay it.

Shortly thereafter Sanders consulted the Commonwealth's attorney of Pike county, Kentucky, and upon the latter's advice procured a warrant for Mullins' arrest. The warrant is dated October 4, 1947, and charges Mullins with having committed a felony "by passing a check for $90 by improper signature with intent to defraud the said affiant, Roy Sanders."

On the next day, Sunday, October 5th, J. H. Steffy, deputy sheriff of Pike county, with the warrant in his possession, accompanied by Sanders, and in the latter's automobile, came to Clintwood in search of Mullins. The two men got in touch with Ross Phillips, deputy sheriff of Dickenson county, showed him the Kentucky warrant, and took him in Sanders' car to Mullins' home, some four miles from Clintwood, where they arrived about 2:30 p. m.

While there is some conflict in the evidence as to just what then occurred, in the consideration of the sufficiency of the evidence such conflict must, of course, be resolved in favor of the plaintiff, Mullins. According to Mullins, Steffy, the Kentucky deputy sheriff, showed Mullins the warrant and told him that he had come to see about the check which he (Mullins) had given Sanders in the purchase of the motor. Mullins replied that the check was good and that there was ample money in the bank to meet it. Sanders interposed that he "wanted the money" for the amount of the check plus Steffy's fee and their expenses. Mullins suggested that they go to Dante, Virginia, where Carter, Mullins' partner, was confined in the hospital, and procure Carter's signature to a "new check." To this Sanders replied: "I don't want a check, but the money or you go to jail." Since, as Mullins said, "it was Sunday" and the bank was closed, he could not comply with Sanders' demand. Thereupon Mullins was taken into custody by the local deputy sheriff.

At the suggestion of Phillips the party, consisting of Sanders, the two deputy sheriffs and Mullins, proceeded to the home of the Commonwealth's attorney for Dickenson county, where Phillips sought the advice of that official. Again the subject of the payment of the check by Mullins was discussed. The Commonwealth's attorney advised Mullins to pay the check. Mullins explained that he had sufficient money in bank, but since it was Sunday he was unable to get a check cashed. Again he offered to give Sanders a check properly signed, and again Sanders demanded that he be paid in cash, or else that Mullins be put in jail. Finally, the Commonwealth's attorney advised Phillips, the local deputy, that unless the parties could get the matter satisfactorily adjusted, he, the deputy, should take Mullins to jail. This was done.

Upon reaching the jail at Clintwood, Phillips telephoned the acting trial justice who lived in the same town, explained the situation to this official, and asked for his instruction. According to the words of the acting trial

justice, "I told him that all he could do was hold the prisoner. I told him I would issue a warrant the next morning. I didn't have any warrants at home at that time."

In compliance with this direction Mullins was placed in jail and kept there until the next morning when the acting trial justice issued a warrant for his arrest as a fugitive from justice from the State of Kentucky, based on the Kentucky warrant, and released him on bail to appear on the following Saturday. On the latter day the matter was heard before the justice and Sanders appeared to prosecute Mullins under the local warrant. At the conclusion of this hearing Mullins was held under the warrant for the action of the Kentucky authorities.

At the February, 1948, term of the Circuit Court of Pike county Mullins was indicted for "unlawfully and feloniously obtaining" property from Sanders "with intention to commit a fraud" by means of the check. At the time of the trial of the present case that indictment was still pending.

Code, sec. 5070-n reads thus: *"Arrest Without a Warrant.—*The arrest of a person may be lawfully made also by any peace officer or a private person without a warrant upon reasonable information that the accused stands charged in the courts of a State* with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused shall be taken before a judge, justice, justice of the peace or other officer authorized to issue criminal warrants in this State with all practicable speed and complaint made against him under oath setting forth the ground for the arrest as in the preceding section; and thereafter his answer shall be heard as if he had been arrested on a warrant." (Acts 1940, ch. 305, p. 482.)

 Since the Kentucky warrant on its face charged Mullins with the commission of a felony, it constituted "reasonable information" to the deputy sheriff of Dickenson

---

*It is manifest from a reading of the related sections, 5070a-5070ee, both inclusive, dealing with the extradition of criminals, that the words "a State" here refer to a State other than the State of Virginia.

county that Mullins stood charged in the courts of another State with a crime, punishable by "imprisonment for a term exceeding one year," and justified the local officer in arresting him without a warrant within the meaning of this section. But under the further terms of the statute, "when so arrested" the accused must be "taken before a judge, justice, justice of the peace or other officer authorized to issue criminal warrants in this State with all practicable speed and complaint made against him under oath setting forth the ground for the arrest."

Similar statutes requiring that arrested persons be taken promptly before a committing authority have been adopted by Congress and the legislatures of nearly all of the States. Under such statutes it is the duty of the officer or person making the arrest to take the accused within a reasonable time, or without unnecessary delay, before a judicial officer in order that a charge may be formulated against him. *Winston* v. *Commonwealth*, 188 Va. 386, 394, 395, 49 S. E. (2d) 611, 615, and authorities there cited.

It is uniformly held that unreasonable delay in failing to comply with such statutory mandate constitutes false imprisonment. As is said in 22 Am. Jur., False Imprisonment, sec. 20, p. 366: "It is the duty of an officer or other person making an arrest to take the prisoner before a magistrate with reasonable diligence and without unnecessary delay; and the rule is well settled that whether the arrest is made with or without a warrant, an action for false imprisonment may be predicated upon an unreasonable delay in taking the person arrested before a magistrate * * *, regardless of the lawfulness of the arrest in the first instance." See also, 35 C. J. S., False Imprisonment, secs. 30, 31, pp. 545-547; *Sands & Co.* v. *Norvell*, 126 Va. 384, 101 S. E. 569.

Moreover, any person who causes, induces, aids, assists, or encourages an officer to delay unreasonably in bringing the arrested person before the committing judicial officer is likewise liable for such unlawful imprisonment. 22 Am. Jur., False Imprisonment, sec. 32, p. 372; 35 C. J. S., False

Imprisonment, secs. 37, 38, pp. 550-552; *Sands & Co.* v. *Norvell, supra.*

Conversely, if an arrest is legal the third person causing it cannot be held responsible for the conduct thereafter of the arresting officer, unless it be shown that the latter acted on the authority of the third person or that such conduct was caused by him. 22 Am. Jur., False Imprisonment, sec. 32, p. 372.

Whether an arrested person has been brought before a magistrate "with all practicable speed," as is required by Code, sec. 5070-n, or without unnecessary delay, depends upon the circumstances of the particular case. 22 Am. Jur., False Imprisonment, sec. 85, p. 412. Ordinarily, this is a question for the jury unless the facts are undisputed. 4 Am. Jur., Arrest, sec. 70, p. 50.

In sustaining the motion to strike the plaintiff's evidence the trial court held, as a matter of law, that Phillips, the local arresting officer, had acted "with all practicable speed" under the circumstances in bringing Mullins before the acting trial justice on the morning following the arrest, or, in other words, that the delay was not so unreasonable as to constitute false imprisonment. If that position be correct, and the arresting officer was not guilty of false imprisonment, then necessarily the defendant, Sanders, who instigated the arrest, was likewise not guilty of false imprisonment.

The circumstances which occasioned the delay are not in dispute. The arrest was made on Sunday afternoon. Not satisfied with the advice which he had received from the Commonwealth's attorney, Phillips, the local deputy sheriff, telephoned the acting trial justice at the latter's home and apprised him of the situation. The acting trial justice recognized that it was his duty to issue the warrant formulating a charge against Mullins, but since, as he said, he did not have at his home the necessary forms, he would issue a warrant "the next morning." Consequently, he directed the arresting officer to "hold the prisoner" until that time.

Whether this conduct of the acting trial justice was proper under the circumstances is not before us. In no event could

the arresting officer, or the defendant, Sanders, who instigated the arrest, be held responsible for the delinquency, if any, of the justice. Our concern is whether the local deputy sheriff was justified in following these directions. In our opinion he was. He had no control over the actions of the trial justice and could not compel that official to come to his office forthwith and issue the necessary warrant against the prisoner. While he might have taken the prisoner "before" or into the physical presence of the acting justice at the latter's home, this would have been futile, as that official had said that he was not then prepared to issue the warrant.

Inasmuch as the nearest committing judicial officer had, in effect, declined to issue a warrant during the Sunday afternoon, the deputy sheriff was not, in our opinion, under the duty to travel about the county with the plaintiff in search of another judicial officer who might be willing to act.

We agree with the trial court that under the circumstances the arresting officer was not guilty of unreasonable delay in producing the plaintiff before the committing officer, but that he did so "with all practicable speed," as required by the statute.

Moreover, even if it be assumed that the delay of the arresting officer, Phillips, in bringing the plaintiff before the acting trial justice, or another committing officer, was unreasonable or unjustifiable, there is no evidence that the defendant, Sanders, was in any way responsible for the delay. Sanders did not advise or direct the arresting officer as to what course the latter should follow. See 22 Am. Jur., False Imprisonment, sec. 32, p. 372. Compare *Sands & Co.* v. *Norvell, supra,* where the agent of the corporation which instigated the arrest actively participated in the delay.

For these reasons we are of opinion that the evidence of the plaintiff failed to make out a case of false imprisonment.

In *Glidewell* v. *Murray-Lacy & Co.,* 124 Va. 563, 98 S. E. 665, 4 A. L. R. 225, this court dealt with an action for abuse of process where the plaintiff claimed that the defendants had misused or abused the criminal process of the

court by causing the plaintiff's arrest for the purpose of collecting a debt. We there pointed out that, "Abuse of process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or commanded by the writ. In brief, it is the malicious perversion of a regularly issued process whereby a result not lawfully or properly attainable under it is secured." (124 Va., p. 570.)

Continuing, we said: "The distinctive nature of an action for abuse of process, as compared with the actions for malicious prosecution and false imprisonment, is that it lies for the improper use of a regularly issued process, not for maliciously causing process to issue, or for an unlawful detention of the person." (124 Va., p. 569.)

We quoted with approval the following from Cooley on Torts, 3d Ed., Vol. I, p. 355 (4th Ed., Vol. I, section 131, p. 437): "Two elements are necessary to an action for the malicious abuse of legal process: First, the existence of an ulterior purpose; and second, an act in the use of the process not proper in the regular prosecution of the proceeding. The regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process." (124 Va., p. 570.)

For a similar treatment of the subject, see 1 Am. Jur., Abuse of Process, section 2, p. 176, section 3, pp. 176, 177, section 6, pp. 178, 179.

Again, as we pointed out in the *Glidewell Case*, to sustain an action for abuse of process proof of malice is not necessary as to the issuance of the process, but "it is necessary to allege and prove that the process after being properly sued out was maliciously misused or abused." (124 Va., p. 571.)

In an action for abuse of process, as distinguished from an action for malicious prosecution, it is not necessary to aver and prove the termination of the proceeding in which the process was issued. It is sufficient that one party has wilfully abused the process after its issuance to the damage of the other. 1 Am. Jur., Abuse of Process, section 9, p. 180; 50 C. J., Process, section 381, p. 618.

■ Nor is advice of counsel a bar to an action for abuse of process, although it may be shown in mitigation of damages. 1 Am. Jur., Abuse of Process, section 15, p. 183, section 40, p. 194.

It is sometimes broadly said that the use of criminal process to enforce the collection of a debt will support an action for abuse of process. 1 Am. Jur., Abuse of Process, section 24, p. 186; 50 C. J., Process, section 376, p. 615. But this statement has its qualifications. As this court said in the *Glidewell Case*, "criminal process cannot be wrongfully used to collect a debt, if by 'wrongfully' is meant a perversion or oppressive use of the process as distinguished from the secret motive which the party may have in procuring its issuance." (124 Va., p. 576.)

■ In other words, the mere fact that the creditor has procured a criminal warrant against the debtor for the ulterior purpose of enforcing the collection of the debt will not of itself support an action for abuse of process, for in addition to incurring civil liability the debtor may have violated the criminal law so as to justify his arrest and prosecution. So long as the creditor merely aids in the prosecution of the criminal proceeding in the regular manner—that is, by procuring the warrant in a proper way and by appearing as a witness for the prosecution in the criminal proceeding—he is not liable in an action for abuse of process, although the criminal prosecution may result in the payment of the debt.

Such was the holding in the *Glidewell Case*. There the defendants had caused the arrest of the plaintiff under a statute making it a misdemeanor to borrow money on a crop and thereafter refuse to comply with the conditions of the loan. Shortly after the arrest the parties made a settlement of the civil liability, and pursuant to Code, section 4849, the warrant was dismissed. This court held that, "Whatever motive and purpose the defendants might have had, what they actually did was in keeping with the object" of the crop lien statute, and with the general legislative policy of the State with reference to the settlement of misdemeanors

of a minor character for which the party aggrieved also had a private remedy, and that, hence, no abuse of process had been shown. (124 Va., p. 572.)

But it is well settled that where the creditor uses the criminal process of the court as a means of oppression, beyond the mere fact of arrest and the regular prosecution of the charge, to compel the debtor to make settlement, or, as was said in *Ledford* v. *Smith*, 212 N. C. 447, 193 S. E. 722, 725, where criminal process is used as "a whip to force the payment of an alleged indebtedness," the action will lie.

Measured by these standards we are of opinion that there was sufficient evidence to go to the jury on this count in the declaration.

The defendant admitted that his primary purpose in procuring the arrest of the plaintiff was to collect a debt. He testified that he told the plaintiff in the presence of the officers that he did not desire to prosecute or embarrass him, that all he wanted was "the money involved," that if he could be assured that the check would be paid, or that if the plaintiff would "get some business man to endorse the check," he (the defendant) would be "perfectly satisfied." According to Phillips, Sanders told Mullins that if the check was paid Mullins would be released. In these negotiations the alternative which the defendant offered the plaintiff was that the latter would be confined in the local jail until he could be extradited and sent to Kentucky to stand trial on a felony charge.

Certainly, under this evidence, the jury would have had the right to say that in instigating the arrest of the plaintiff, the defendant was prompted by an "ulterior motive," namely, to collect the debt due him rather than to punish the plaintiff for his supposed violation of the criminal law.

Moreover, the jury would have had the right to say that this conduct of the defendant, under the circumstances, was "a perversion or oppressive use of the process" beyond what was contemplated in the regular prosecution of the criminal proceeding; that it was the use of the process, as the North

Carolina court aptly characterized it, as a "whip to force the payment of an alleged indebtedness."

The action of the trial court in striking the evidence with respect to the counts charging false imprisonment and malicious prosecution, respectively, is affirmed. For the error of the trial court in striking the evidence with respect to the count charging malicious abuse of criminal process, the judgment complained of is reversed and the case is remanded for a new trial in accordance with the views here expressed. The plaintiff in error having substantially prevailed in this court will recover his costs.

*Affirmed in part; reversed in part.*