264 F.2d 262
 Percy ROSS and Laurian Ross, individually and as co-partners
doing business as Ross & Ross, Ross & Ross, auctioneers,
Inc., a corporation, and John H. Anderson, individually and
as Trustee for Ross & Ross, Appellants,
v.
PECK IRON & METAL COMPANY, Inc., a corporation, Julius Peck
and American National Bank of Portsmouth,
Virginia, Appellees.
 No. 7762.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 15, 1959.
Decided March 9, 1959.
 
 1
 Theodor Herman, Minneapolis, Minn. (Sidney Kelsey, Norfolk, Va., on brief), for appellants.
 
 
 2
 Herbert K. Bangel, Portsmouth, Va. (Bangel, Bangel & Bangel, Portsmouth, Va., on brief), for appellees Peck Iron & Metal Co., Inc., and Julius Peck.
 
 
 3
 Clyde W. Cooper, Portsmouth, Va., for appellee American Nat. Bank of Portsmouth, Virginia.
 
 
 4
 Before SOPER, Circuit Judge, and PAUL and BOREMAN, District Judges.
 
 
 5
 BOREMAN, District Judge.
 
 
 6
 This is an appeal from an order of the District Court granting defendants' motion for summary judgment.
 
 
 7
 Ross & Ross, individually and as partners and operating in a corporate name, are engaged in the business of auctioneering; they will be referred to as 'Ross'. On May 15, 1954, Peck Iron & Metal Company, Inc., one of the defendants below and hereinafter referred to as 'Peck', filed its petition for attachment in the Circuit Court of the City of Portsmouth, Virginia, against Ross, as principal defendant, and several others as codefendants. The grounds for the attachment, as set forth in the petition, were that Ross was a non-resident of the State of Virginia, and that Ross had estate or debts owing to it within the City of Portsmouth, Virginia. The petition for attachment alleged that Ross was indebted to Peck in the amount of $45,000 for certain merchandise sold by Ross and belonging to Peck; that Ross failed and refused to pay Peck the amount due; that the merchandise had been wrongfully sold and that Ross had received the money for it; and that Ross had sold the merchandise contrary to the wishes and instructions of Peck.
 
 
 8
 The writ of attachment was served in person upon Ross and the co-defendants. In its answer, Ross denied all the allegations of the petition although it is conceded that Ross was a non-resident and had estate or debts owing to it in the City of Portsmouth.
 
 
 9
 The American National Bank of Portsmouth, hereinafter referred to as the 'Bank', as one of the co-defendants in the attachment proceeding, filed its answer stating that it held on deposit, in an account carried in the name of John H. Anderson (Trust Account), the amount $21,836.74; that on May 14, 1954, the Bank had issued, for cash, two cashier's checks payable to Ross in the sums of $5,000 and $3,185, which cashier's checks had not been presented for payment as of May 25, 1954, the date of the Bank's answer. The other co-defendants answered stating that they were neither indebted to nor had any property belonging to Ross.
 
 
 10
 On June 3, 1954, Ross appeared in the Circuit Court of the City of Portsmouth and orally moved to quash the attachment, which motion was overruled. Subsequently, on motion of all parties, the action was transferred to the equity side of the court and referred to a Commissioner in Chancery. After several hearings, the Commissioner, on September 15, 1955, filed a report stating that Ross was indebted to Peck in the sum of $44,325.89. Exceptions to this report having been filed by Ross, on October 22, 1956, the said Circuit Court entered an order sustaining in part and overruling in part the exceptions. In this latter order, after reciting the various pleadings and proceedings, including the action of the Court in overruling the motion of Ross to quash to attachment, the Court found and determined that Peck had failed to carry the burden of proof as to the allegations that Ross either failed or refused to make any payment due Peck, or wrongfully sold merchandise belonging to Peck, or sold any articles contrary to the terms of the contract, or refused to accept any bids at auction. However, that Court further found that Ross was indebted to Peck in the amount of $23,859.14 and granted judgment for that amount, ordering that the funds previously attached on deposit in the Bank, to the credit of John H. Anderson Trust Account, or such moneys belonging to Ross in the hands of the Bank, be applied to the payment of the judgment. No appeal having been taken from the decree of the state court within the time allowed, said decree has long since become final.
 
 
 11
 Following the issuance of the attachment, the two cashier's checks, referred to in the Bank's answer in the attachment proceeding, were negotiated by Ross, the payee of the checks, to Fischbein Advertising Agency. When the checks were presented for payment on June 9, 1954, payment was refused and the words 'Payment stopped' were written thereon by the Bank. Fischbein, a foreign corporation, later instituted an action against the Bank in the United States District Court for the Eastern District of Virginia, claiming to be a holder of said cashier's checks in due course and, as such, claiming a lawful priority over the attachment levy. Following a pre-trial conference in this latter action, the Bank paid to Fischbein the amount of the cashier's checks with interest and the case was dismissed with prejudice to the plaintiff on June 30, 1957.
 
 
 12
 In this setting, the plaintiffs as named herein instituted the present action in the District Court against the named defendants. The complaint undertakes to assert three causes of action in substance and effect as follows:
 
 
 13
 1. For alleged wrongful and malicious attachment issued without probable cause, together with some suggestion of malicious abuse of process, compensatory damages $50,000.
 
 
 14
 2. For conspiracy, by and among the defendants, entered into with a malicious intent to injure the plaintiffs in their good name, fame, reputation and credit by means of the alleged wrongful attachment, compensatory damages $25,000, punitive damages $25,000.
 
 
 15
 3. For the wrongful non-payment of the two Cashier's checks payable to Ross, the defendants acting in concert and with malicious intent to injure the plaintiffs in their good name, fame, reputation and credit, compensatory damages $25,000.
 
 
 16
 After issue was joined on these causes of action, the District Court granted defendants' motion for summary judgment and plaintiffs in the court below appeal.
 
 
 17
 It is a fundamental rule that summary judgment should be denied unless there is no genuine issue of fact for trial. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967; Stevens v. Howard D. Johnson Co., 4 Cir., 1950, 181 F.2d 390. The District Court, after reviewing the record in the attachment proceeding in the state court and the facts as disclosed by the pleadings, found no genuine issue of fact for trial.
 
 
 18
 The contentions and arguments of Ross as to the first cause of action are many and varied, making consideration and treatment thereof extremely difficult because of overlapping. We endeavor to state them as follows: That the attachment was issued unlawfully and without probable cause; that there was no debt due Peck at the time of the attachment; that the state court found that Peck had failed to carry the burden of proof as to certain material allegations, thus leaving only non-residency of Ross as the sole ground of attachment; that, by statute, non-residency alone would not support attachment where there was no debt due; that Peck did not 'prevail' in the state court; that, even if Peck did 'prevail' in the attachment proceeding, that fact would not bar this action; that even though the attachment was rightful, it was used in such an oppressive and illegal manner as to constitute an abuse of process; that Peck knew that some of the money in the attached bank account represented proceeds from the auction sale of equipment belonging to third parties; that the attachment suit was brought for the sum of $45,000.00 and judgment obtained for $23,589.14 and this disparity, in itself, was evidence of wrongful use of the extraordinary remedy of attachment.
 
 
 19
 As to the contention that there was no debt due when the attachment action was instituted, if such had been the case, the court could not have granted the judgment. See 1947, 49 C.J.S., Judgments, 20. Therefore, such a contention amounts to an attempt to collaterally attack the judgment in the attachment suit. As stated in 1947, 49 C.J.S., Judgments, 417.
 
 
 20
 'A judgment cannot be impeached collaterally because of any illegality or insufficiency in the cause of action on which it is founded, this not being a jurisdictional defect or sufficient to render the judgment void. Under this rule it is not permissible to collaterally attack the judgment on the ground that the claim in suit * * * was not yet due at the time the action was brought.'
 
 
 21
 It is implicit in the judgment of the Circuit Court of the City of Portsmouth that there was a debt due at the time of institution of the attachment action. See 1947, 49 C.J.S., Judgments, 436.
 
 
 22
 As was held by the District Court, the attachment proceeding was terminated unfavorably to the defendant therein, Ross. Although the court in the attachment proceeding found certain allegations of the plaintiff therein to be unsupported by the evidence, it is not necessary that the plaintiff prove all of his allegations. Under Va.Code, 8-519 (1950), it is only necessary for the attaching party to have a legal or equitable claim to specific personal property, based upon a debt which is due, as well as one or more of the grounds for an attachment.[1] The grounds for attachment are provided in Va.Code, 8-520 (1950).[2]
 
 
 23
 As a general rule, no cause of action for wrongful and malicious attachment will arise if the plaintiff in the attachment suit prevails. 5 Am.Jur., Attachment and Garnishment, 988 (1936). Appellants contend that termination of the attachment action unfavorably to the attachment defendant does not necessarily constitute a bar to an action for wrongful attachment, citing Spengler v. Davy, 1859, 56 Va. (15 Grat.) 381; Maxwell v. Speth, 1911, 9 Ga.App. 745, 72 S.E. 292; Fortman v. Rottier and Hoenig, 8 Ohio St. 548; Perry v. Arsham, 101 Ohio App. 285, 286, 136 N.E.2d 141; Harris v. Beck, 24 Ont. 41; and Marx Bros. v. Leinkauff & Strauss, 93 Ala. 453, 9 So. 818. This may very well be true, as often there are exceptions to a general rule of law. However, it has no application here. There is no denial here of the basic grounds for the attachment, namely, that Ross was a non-resident and had estate or debts owing to it (or them) in the City of Portsmouth; and the existence of the debt was ascertained by the judgment. Therefore, the facts of this particular case bring it within the general rule.
 
 
 24
 Although it is wholly inconsistent with the allegations in the first count of the complaint, there is therein a suggestion of malicious abuse of process. The gravamen of the first cause of action is clearly a wrongful attachment. There are no allegations whatsoever which tend to show a malicious abuse of process, and the plaintiffs do not demand damages for abuse of process. It is fairly obvious to the court that, initially at least, the plaintiffs confused malicious abuse of process with malicious use of process. As stated in 1951, 72 C.J.S. Process 119,
 
 
 25
 'The fundamental distinction between malicious use and malicious abuse of process is that the first it an employment of process for its ostensible purpose, although without probable cause, whereas the second is employment of process for a purpose not contemplated by law. Another distinction is that, in case of malicious use, it must be shown that the action in which the process was used has terminated favorably to the plaintiff in the suit at bar, whereas this is unnecessary in an action for malicious abuse.'
 
 
 26
 However, since it seems to have been assumed throughout the proceedings that Count I charges malicious abuse of process, this court will consider the matter.
 
 
 27
 The crux of the tort of abuse of process, whether civil or criminal, lies in the malicious abuse or misuse of a process or writ which has been lawfully and properly issued; in other words, although the writ was issued upon the proper grounds and with probable cause, it was caused to issue and was used, not for the purpose for which it was intended, but for some collateral object. Mullins v. Sanders, 1949, 189 Va. 624, 54 S.E.2d 116; Glidewell v. Murray-Lacy & Co., 1919, 124 Va. 563, 98 S.E. 665, 4 A.L.R. 225; Psinakis v. Psinakis, 3 Cir., 1955, 221 F.2d 418; Slaff v. Slaff, D.C.S.D.N.Y.1957, 151 F.Supp. 124; Gore v. Goreman's, Inc., D.C.W.D.Mo.1956, 148 F.Supp. 241; Hauser v. Bartow, 1937, 273 N.Y. 370, 7 N.E.2d 268; 1951, 72 C.J.S., Process, 119. The regular use of process cannot constitute abuse, even though the user was actuated by a wrongful motive, purpose, or intent, or by malice. Mullins v. Sanders, supra; Slaff v. Slaff, supra; Hauser v. Bartow, supra; 1951, 72 C.J.S., Process, 120. The test, therefore, is whether the attachment writ was used for the purpose for which it was designed by the law, or whether, on the contrary, it was used to secure some collateral advantage to the user or to cause some collateral disadvantage to the other party.
 
 
 28
 The chief purpose of attachment proceedings is to secure a contingent lien on the defendant's property until the plaintiff can, by appropriate proceedings, obtain a judgment and have such property applied to its satisfaction. 1937, 7 C.J.S., Attachment, 2. It is clear from the record that this is exactly the use that was made of the attachment process in the state court. In their brief submitted here, the appellants attempt to lead the court to believe that the fund attached was not the property of Ross and that Peck knew this when it had attachment issued against it. Appellants contend that the attachment was thus misused for some ulterior purpose. However, this contention is unacceptable because in their complaint filed in this case, one of the plaintiffs' allegations is that said fund belonged to and was owned by the plaintiffs, Ross & Ross, individually and as co-partners. It is also, perhaps, significant that the amount attached was not sufficient to satisfy the judgment obtained. There is, therefore, nothing in the record of this case upon which a cause of action for malicious abuse of process can be predicated.
 
 
 29
 The second cause of action charges a conspiracy to commit the acts charged in the first cause of action. 'A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means.' 1939, 15 C.J.S., Conspiracy, 1. Therefore, as was held by the District Court, if there exists no cause of action predicated upon an alleged malicious and wrongful attachment, and if no cause of action lies for malicious abuse of civil process, it follows that the alleged conspiracy as stated in the second cause of action must fail.
 
 
 30
 In the third cause of action, the plaintiffs claim that they have been damaged by the alleged conspiracy between Peck and the Bank to dishonor the cashier's checks payable to Ross. As to the question raised herein, this is apparently a case of first impression. No convincing authority is cited and none has been found.
 
 
 31
 It is true that generally a bank's wrongful dishonor of an ordinary check gives rise to a cause of action, in favor of the depositor who drew the check. In the case of a trader or merchant, substantial damages are presumed because of slander of credit. See annotation 126 A.L.R. 206 (1940). However, there is a radical difference between the characteristics of an ordinary check and those of a cashier's check. An ordinary check is a bill of exchange purporting to be drawn on the drawer's deposited funds in a particular bank, and is the primary obligation of the depositor. Therefore, when a bank dishonors such check, the adverse reflection is upon the depositor who drew the check and the dishonor creates the inference that such depositor drew the check knowing it to be worthless and countermandable, thus resulting in injury to the depositor's reputation and credit; and if the dishonor is made while the depositor has sufficient funds on deposit to pay the check, the law gives a right of action against the drawee bank.
 
 
 32
 On the other hand, a cashier's check is a bill of exchange drawn by a bank upon itself, accepted in advance by the act of issuance, and is a non-countermandable promise by the bank to pay, a primary obligation of the bank. 1938, 10 C.J.S., Bills and Notes, 5; 7 Am.Jur., Banks, 525 (1937); annotation 107 A.L.R. 1463, 1464 (1937). Thus, the bank assumes the dual position of drawer and drawee. Once the cashier's check is negotiated to a holder in due course, the credit and resources of the payee are no longer primarily involved; and upon presentment for payment, the bank must honor the check. For a comprehensive analysis of a cashier's check and the distinctions between it and an ordinary check, see First National Bank of Portland v. Noble, 1946, 179 Or. 26, 168 P.2d 354, 169 A.L.R. 1426.
 
 
 33
 In view of the inherent characteristics of a cashier's check, it follows that the issuing bank, in refusing payment of such check, is dishonoring its own obligation and thereby injuring only its own reputation and credit. Since the law is perfectly clear that a cashier's check cannot legally be countermanded or dishonored when presented by a holder in due course, we are not persuaded that any injury to the reputation or credit of the payee could result simply from the wrongful and illegal dishonor of its own obligation by the issuing bank upon presentment by a holder in due course.
 
 
 34
 The effect of dishonor by non-payment was merely to give the holder (Fischbein) a right of recourse against one secondarily liable, such as an endorser (Ross), who would stand as surety for the party primarily liable, the Bank. As was stated by the District Court, Ross was not sued as an endorser, nor is there any allegation that Ross was ever called upon to make payment. If any right of action existed, it rested in Fischbein whose claim was settled in an action against the Bank. While Sec. 8-545 of the Code of Virginia 1950, gives a holder in due course of negotiable paper a priority over an attachment levied upon the seized property, this in no sense grants a right of action in tort to a party secondarily liable on the negotiable instrument. The theory that the action is in the nature of slander for the wrongful dishonor of a merchant's check is clearly inapplicable to the facts here presented. The third cause of action does not state a claim for which any right of action may be maintained.
 
 
 35
 There being no genuine issues presented for disposition, the action of the District Court in granting summary judgment is
 
 
 36
 Affirmed.
 
 
 
 [1]
 Section 8-519, Code of Virginia (1950):
 'If any person have a claim, legal or equitable, to any specific personal property, or a like claim to any debt, whether such debt be due and payable or not, or to damages for breach of any contract, express or implied, or to damages for a wrong, and such claim exceed twenty dollars, exclusive of interest, he may sue out an attachment therefor on any one or more of the grounds stated in the following section, except that if the claim be for a debt not due and payable no attachment shall be sued out when the only ground for the attachment is that the defendant, or one of the defendants against whom the claim is, is a foreign corporation, or is not a resident of this State, and has estate, or has debts owing to such defendant, within this State.'
 
 
 [2]
 Section 8-520, Code of Virginia (1950):
 'It shall be sufficient ground for an attachment that the principal defendant * * * (1) Is a foreign corporation, or is not a resident of this State, and has estate or has debts owing to such defendant within the * * * city in which the attachment is * * *.'